**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5132-15T2

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

SHAWN CUSTIS,

    Defendant-Appellant.

_____

Argued November 26, 2018 – Decided December 21, 2018

Before Judges Sabatino, Sumners and Mitterhoff.

On appeal from Superior Court of New Jersey, Law Division, Essex County, Indictment No. 14-01-0204.

Tamar Y. Lerer, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Tamar Y. Lerer, of counsel and on the briefs).

Frank J. Ducoat, Special Deputy Attorney General/Acting Assistant Prosecutor, argued the cause for respondent (Theodore N. Stephens, II, Acting Essex County Prosecutor, attorney; Frank J. Ducoat, of counsel and on the brief).

Appellant filed a pro se supplemental brief.

PER CURIAM

After a lengthy jury trial, defendant was found guilty of first-degree robbery, second-degree aggravated assault, and other offenses. The offenses were committed in the course of a home invasion, in which the perpetrator broke into the victim's residence during the day when she was at home with her preschool-aged daughter and infant son. The invasion and the brutal physical attack upon the victim were recorded on "nanny-cam" equipment at the residence. A portion of that video was broadcast on local television stations, prompting women who personally knew defendant to come forward and identify him as the attacker shown on the video.

Defendant was thereafter arrested when leaving his girlfriend's New York City apartment building. A search of those premises uncovered evidence tying him to the home invasion and robbery. This prosecution ensued, resulting in the jury's guilty verdict. The trial court imposed on defendant an extended-term sentence of life imprisonment, with additional consecutive and concurrent terms.

On direct appeal, defendant raises numerous issues. Among other things, he argues: (1) the trial court should have suppressed the items seized from his

2

girlfriend's apartment without valid consent to perform a search of the premises; (2) the identifications of the four women based on the nanny-cam video footage were unreliable and inadmissible; (3) the jury received inadequate instructions on identification; (4) the victim's ultimate identification of him was tainted and improperly admitted; (5) two prosecution witnesses gratuitously and prejudicially referred to their fear of defendant; (6) the court unfairly allowed a government agent to provide opinion testimony about a footwear match; and (7) defendant's life sentence is manifestly excessive.

For the reasons that follow, we affirm defendant's convictions and sentence, except to direct the trial court to amend the judgment to merge the aggravated assault conviction into the robbery conviction.

## Table of Contents

I. (Factual and Procedural Background). ....................................................... 3
II. (Apartment Search Issues) ................................................................... 25
III. (Lay Witness Identification Issues) ....................................................... 42
IV. (Victim Identification Issues) .............................................................. 62
V. (Fear Testimony Issues) ...................................................................... 66
VI. (Footwear Expert Issue) ..................................................................... 71
VII. (Other Issues) ............................................................................... 75

## I.

## (Factual and Procedural Background)

3

<u>The Videotaped Home Invasion and the Attack of the Victim</u>[1]

On the morning of June 21, 2013, at about 10:25 a.m., C.R.[2] was in the kitchen of her home in Millburn Township.  She was making breakfast for her three-year-old daughter, E.R., who was on the couch in the living room, watching cartoons.  C.R.'s one-year-old son was napping upstairs in his crib.

Around this time, E.R. turned off the television and ran towards her mother, saying that someone was at the front door.  C.R. went to look out the front window, but she saw no one there.

C.R. then heard a loud noise from the back entrance of the house.  As she turned around, she saw a man charging after her.  The assailant appeared to be hunched over and swaying back and forth, like a boxer.  C.R. noticed that he was African-American, about 5'8" tall, about her age (in his forties), had salt-and-pepper facial hair, and was wearing a white, short-sleeve, crew-neck t-shirt and denim jeans.

---

[1]  We necessarily discuss the facts in considerable detail because of the copious pretrial and trial record spanning nearly forty transcripts, the lengthy trial, the parties' overlength appellate briefs, and the many legal issues posed on appeal.

[2]  We use initials to protect the privacy of the victim, her children, and several civilian witnesses who were involved in the State's investigation.

The assailant proceeded to attack C.R. in front of her daughter. As C.R. was pummeled to the floor, she remained quiet, because she did not want her daughter to scream and have the assailant get mad and start punching her as well. Her plan was to keep quiet and take the beating, in order to keep the attention on her and protect her children.

The assailant threw C.R. down, held her down with his legs, beat and choked her, kicked her in the face, and demanded to know where she kept her pocketbook. He taunted her while she was on the floor, exclaiming, "Where are you going, where do you think you're going?" The beating was so vicious C.R. thought she would die.

C.R. lapsed in and out of consciousness, and although her mind was telling her to get up, she felt limp and could not move. While the assailant was upstairs, she attempted to get to the phone, but was unable to do so. When the assailant returned downstairs, he dragged her to the basement door and threw her down the stairs.

The home invasion and assault were over within four minutes. During that time, the assailant took the jewelry C.R. was wearing, including her wedding rings and a necklace with her children's names on it. He also took a baby monitor, C.R.'s cell phone, and a watch belonging to C.R.'s husband.

A-5132-15T2

C.R. lost consciousness after being thrown down the basement stairs, and she did not know how long she was out. At some point, however, she regained consciousness, crawled over to the home computer, and sent an unintelligible email to her husband. She also called 9-1-1 to report the crime.

Thereafter, C.R. crawled upstairs to find her children. She found E.R. in the living room, scared, and her son upstairs, sleeping.

The Ensuing Police Investigation

Millburn police responded to C.R.'s home. Upon arrival, they observed C.R. holding her infant son, and her daughter appeared frightened. C.R. looked like she had "taken a terrible beating." The right side of her face was red and swollen, her right eye was almost swollen shut, and her mouth was bleeding. She was crying and disoriented, unable to respond to the officers' questions, and unable to give a written statement.

C.R. testified at trial that she suffered a concussion from the beating, as well as permanent injuries to the right side of her face. She also suffered a sprained knee, and a sacral fracture that still caused her pain when she was in a seated position.

The police took a statement from C.R. later in the day on June 21, at the hospital. The officers testified that she still seemed disoriented at that time.

6

Audio of her police statement was played for the jury. In that statement, C.R. told the police that her assailant was about 5'7" or 5'8", African-American, and wearing a white t-shirt and jeans. He was bald; she did not think he had any facial hair; and she believed he was in his late thirties or early forties.[3]

When C.R. later went to the police station to view a photo array, she did not identify defendant as her assailant. She hesitated between the photo of defendant and the photo of another man. She ultimately said the other man "possibly" was her assailant, but she was not entirely sure. Later at trial, however, C.R. expressed her belief that she never intended to exclude defendant as a possibility. She explained that she could not identify defendant based upon the photo shown to her at that time, because in the photo he appeared much younger than he appeared at the time of the attack. At trial, C.R. testified that defendant was her attacker. She stated she was "100 percent sure" and had "no doubt" about it.

C.R. recounted that she and her family had left town after the home invasion, and they returned only after she saw video of defendant's arrest and she was sure the police had arrested the right person.

---

[3] Defendant was forty-two at the time of the crime.

 A-5132-15T2

Investigation of the Crime Scene and Other Leads

After responding to the victim's 9-1-1 call, police officers processed the crime scene. They found the back door of the home had been forced open. They took fingerprints, but they did not identify any belonging to defendant.[4]

The police also attempted to track C.R.'s cell phone, which had been stolen. However, the phone was turned off shortly after the home invasion. Therefore, the police were unable to track it beyond a nearby bus stop.

While canvassing the area around the victim's home, the police recovered a baby monitor from a storm drain. The police could not extract any fingerprints from the monitor. However, C.R. identified it as belonging to her.

Also, while canvassing the area, the police obtained videos from a business located near C.R.'s home, which were taken on the date of the crime, around the time of the crime. At trial, the prosecutor showed those videos to the jury. They depicted a man who could be defendant walking in close proximity

---

[4] One of the police officers involved in processing the crime scene uttered racial epithets when referring to the assailant, which were captured on the portion of the nanny-cam video recording the officers' arrival. The officer denied tampering with any evidence in the case, and there was no proof of tampering introduced at trial.

to the crime scene, and near where C.R.'s phone was tracked immediately after the crime.[5]

The Nanny-Cam Video Footage, Television Reports, and the Ensuing Identifications of Defendant

After C.R.'s husband arrived, the police learned that the residence was equipped with a nanny-cam system, which captured the four-minute home invasion incident on video. This video was played for the jury at trial.[6]

From the video, the police observed that the perpetrator was a dark-complexioned African-American man, appearing to be about 5'8" tall, in his late-thirties, with facial hair, wearing a white t-shirt, loose-fitting blue jeans with a back belt, a metal watch on his left wrist, and what appeared to be white Nike sneakers with the black swoosh insignia on the sides. The perpetrator also appeared to be left-handed, based upon his use of his left hand and left leg to strike the victim, and her injuries to the right side of her face. The attacker's facial features on the video are somewhat blurry.

---

[5] The court, sua sponte, struck opinion testimony from a police officer that he believed the man in the videos was defendant.

[6] We have been furnished with a copy of the video, which we have reviewed as part of our consideration of the issues on appeal.

The police contacted the Federal Bureau of Investigation ("FBI") for assistance in identifying the make and model of the assailant's sneakers. At trial, Agent Brian McVicker, an FBI forensic footwear and tire examiner, testified that, based upon his review of the surveillance images, the perpetrator was wearing Nike brand sneakers. Based upon his comparison of the perpetrator's sneakers to Nike sneakers advertised on Zappos.com, McVicker opined that the perpetrator was wearing Nike Air Ring Leader Low sneakers.

The police initially were unable to identify the perpetrator from the video, even after sending out still "screen shots" to local law enforcement. A few days after the home invasion, the police released the video to the press, in the hope that people who "were familiar with the suspect would come forward and provide . . . valuable information."

Public release of the video resulted in the police receiving many calls, with callers identifying several possible suspects. Many of those calls did not result in useful leads. However, two callers in particular led the police to identify defendant as the prime suspect in the crime as of June 26, 2013 (five days after the home invasion): G.N., and J.A., who brought his ex-wife, D.S.-A., to speak to the police.

D.S.-A. had a brief relationship with defendant in June 2013. According to D.S.-A., after three weeks "he told me [he] loved me and he don't even know me," so she told him not to call her anymore. Defendant then "got angry" and "said a few words," and they never spoke again.

D.S.-A. next saw a person who she thought was defendant on television, when a news program she was watching showed a portion of the video of the Millburn home invasion. She recognized defendant from on the video. D.S.-A. contacted her J.A., who, in turn, contacted the police.

D.S.-A. reported to police what she knew about defendant, including his first name, and the fact that he was living between Irvine Turner Boulevard in Newark and New York City. She also accompanied the police to the T-Mobile store so they could obtain records of her phone log to obtain defendant's phone number, which she had recently deleted.

A few days later, the police spoke to D.S.-A. again, and they showed her video of a man walking down Halsey Street in Newark, as well as some photographs. She identified defendant as the man in the video and photos. When D.S.-A. later heard the audio on the nanny-cam video, she identified the assailant's voice as belonging to defendant, and she did so again at trial.

Another witness for the State, G.N., testified that she met defendant in Newark in February 2013. Thereafter they spent time together for about two months and had an intimate relationship. A few months later, during the week of June 24, 2013, G.N. was watching the television news and saw a video clip of the Millburn home invasion. She recognized defendant as the assailant based upon his body weight, his bald head, his dark skin, his limp, and his being left-handed. In addition, the news broadcast said the assailant had facial hair, and she knew that defendant did as well.

After watching the video, G.N. called the phone number given on the newscast and was connected to the Millburn Police Department. She told the police that the person in the video was defendant, and she gave them his name, birth date, and address, on Irvine Turner Boulevard in Newark.

Later, after learning that defendant had been arrested, G.N. gave a formal statement to the police, in which she identified defendant as the man in the nanny-cam video. When the prosecutor played the nanny-cam video for G.N. with the audio attached, she identified the assailant's voice as belonging to defendant.

Using information received from D.S.-A. and G.N., the police attempted to locate defendant. In particular, researching the cell phone number D.S.-A.

had given to them, the police determined that it belonged to defendant, and they obtained a warrant to track that phone. They also obtained a photo of defendant. They identified several addresses associated with defendant, including apartments on Irvine Turner Boulevard in Newark, and on 10th Avenue in Manhattan.

The Pawn Shop Transaction and Related Video

Continuing their investigation, on June 26, 2013, the police visited a pawn shop on Halsey Street in Newark, attempting to recover some of the property that was stolen from C.R.'s home. They never recovered those items. However, they discovered that defendant had made a transaction at the pawn shop two days earlier, on June 24, 2013, at which time he provided an Essex County identification card that listed his address on Irvine Turner Boulevard in Newark, and his height and weight as 5'8", 235 pounds.

The police obtained video from defendant's visit to the pawn shop. The prosecution introduced this evidence at trial in order to show similarities between defendant's appearance on the pawn shop video and the appearance of the assailant in the nanny-cam video, including his movements and his use of his left hand to write.

After leaving the pawn shop, the police attempted to locate defendant at Newark Penn Station, but were unable to do so. They then received information indicating defendant was in the area of Journal Square in Jersey City, so they proceeded to that location. They searched the PATH train station at Journal Square, as well as a few PATH trains, but did not locate defendant.

The police thereafter received information that placed defendant in New York City. However, they could not continue their pursuit at that time because they did not yet have a federal Unlawful Flight to Avoid Prosecution ("UFAP") warrant to pursue him outside of New Jersey. They obtained such a UFAP warrant on June 28, 2013.

Information from C.B. and A.B., and Defendant's Abrupt Departure from Their Residence

On June 28, the police executed a search warrant at the residence on Irvine Turner Boulevard in Newark. They did not find defendant at the address, nor did they find any of his clothing. However, they found documentation indicating that he resided there.

The police also obtained information about defendant from other residents at the Irvine Turner Boulevard building: C.B., defendant's girlfriend, and A.B., C.B.'s adult daughter. Upon questioning by the police, both women identified defendant as the man on the nanny-cam video.

14

A.B. testified that one night during the week of June 24, 2013, she was watching the television news and saw a broadcast of the nanny-cam video. She identified defendant as the assailant on the video, based upon his general physical appearance, including his build, clothing, and facial hair, as well as his limp, and his being left-handed, consistent with the images on the video. After watching the video, she immediately went upstairs to her mother's bedroom, where her mother and defendant were lying down, watching television.

A.B. told defendant he was on the news, at which time C.B. and defendant changed the channel to the news program and watched the nanny-cam video. C.B. immediately identified defendant as the man attacking C.R. on the video. At trial, C.B. testified to consistencies between the video and her knowledge of defendant's general appearance and clothing, as well as his movements, including his limp. There was no one thing that made her certain it was defendant on the video. It was "[e]verything," and there was no doubt in her mind it was him.

Defendant denied it was him, but he got out of bed and began pacing, appearing nervous. He asked C.B. if it looked like him on the video, and she said yes. Shortly thereafter, defendant asked C.B.'s eleven-year-old daughter for money, and he left C.B.'s home, explaining that he needed to "find out what's

15

going on." A couple of days later, he returned to her home while A.B. was there, and retrieved his belongings.

Neither C.B. nor A.B. contacted the police after seeing the nanny-cam video. C.B. explained that she did not want to "snitch" on defendant or see him get in trouble. The women did not provide their information to the police until the police executed the search warrant on June 28, 2013. C.B. still felt badly about telling the police what defendant did, because she felt a sense of loyalty to him, but she also felt she had to tell the truth.

Upon hearing the audio for the video, both C.B. and A.B. were able to identify the assailant's voice as belonging to defendant. C.B. also identified defendant's voice when the video was played for her at trial.

Defendant's Arrest and the Search of the New York Apartment

After it was determined defendant was not at C.B.'s home in Newark, FBI task force officers proceeded to the Tenth Avenue address associated with defendant in New York City. Once there, they waited for additional officers to arrive. Around that time, another officer tracked a second cell phone associated with defendant.[7]

---

[7] The court instructed the jurors that the police needed a court order to track defendant's cellphone on June 28, 2013. The court further instructed that the

While waiting for those other officers to arrive, FBI agents observed defendant leaving the apartment building, and they placed him under arrest. Upon searching defendant, they seized his Essex County identification card, indicating an address on Irvine Turner Boulevard in Newark. They also seized an identification from a New York City hospital, indicating defendant's address was on 10th Avenue in New York City.

Officers then proceeded to the New York apartment, with defendant in tow. When defendant's girlfriend, M.J., answered the door, the police advised her of the reason for their presence. They subsequently obtained her written consent to search the apartment. M.J. testified she had an associate's degree and worked at a marketing firm. She met defendant on a bus in March 2013, after which they began a dating relationship and got engaged.

The Bloody Jeans and Other Seized Evidence

During the search of M.J.'s bedroom, police took several items of clothing into custody, including a pair of jeans with red stitching on them, similar to the jeans the perpetrator was wearing in the nanny-cam video, and a pair of Nike

---

failure to obtain such a warrant did not result in any finding of illegality of the search of the New York City apartment.

Air Ring Low sneakers. The police also seized the clothing defendant was wearing at the time of his arrest, and the items in his possession.

The jeans recovered from M.J.'s apartment had a bloodstain on them, so the police sent them for DNA testing. DNA from the bloodstain corresponded with the victim's DNA profile.

The Indictment

Defendant was thereafter charged in a multi-count indictment with various offenses. The charges included, among other things, attempted murder, aggravated assault, robbery, and endangering the welfare of a child.

Defendant's Cellblock Threat

Detective Alexis Peroso from the Essex County Sheriff's Office testified that in March 2016, while performing courtroom security duties and retrieving a prisoner from a courtroom cellblock, defendant asked her where another officer was, and she responded that she did not know. Thereafter, defendant began speaking loudly with another prisoner in one of the cells. As Peroso and another Sheriff's Officer proceeded to move their prisoner, defendant was standing in the front of his cell with his hands on the bars. He made eye contact with Peroso and said "when this gate opens, I'm going to bash your face in like

I did that bitch in Millburn." Ricardo Rickards, the Sheriff's Officer who was assisting Peroso, also heard defendant make this statement.

The Suppression Motions

Before trial, defendant moved to suppress items found during the warrantless search of M.J.'s apartment in New York City. After considering testimony and argument, the court denied the motion in an oral opinion issued on February 19, 2016.

Also before trial, defendant moved to suppress lay opinion identifications of defendant made after the proposed witnesses had seen video of the home invasion captured on the victim's nanny-cam. The court conducted a hearing on the issue pursuant to N.J.R.E. 104. On March 9, 2016, by oral and written opinions, the court granted the State's motion to admit the identification testimony of the four women.

The Jury Trial and Verdict

A lengthy trial occurred over intermittent dates between April 19 and June 1, 2016. Defense counsel principally argued defendant had been misidentified as the perpetrator. The defense also suggested the pants recovered from the search of M.J.'s apartment had been planted by police officers, one of whom had made racial epithets in referring to the perpetrator.

19

The jury acquitted defendant of attempted murder, but convicted him on all other counts of the indictment, specifically: count two, second-degree aggravated assault, N.J.S.A. 2C:12-1(b)(1); count three, third-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a); count four, first-degree robbery, N.J.S.A. 2C:15-1(a)(3); count five, second-degree burglary, N.J.S.A. 2C:18-2(b)(2); count six, third-degree criminal restraint, N.J.S.A. 2C:13-2(a); and count seven, third-degree theft by unlawful taking, N.J.S.A. 2C:20-3(a).

Sentencing

The trial court granted the State's applications to sentence defendant to an extended term as a persistent offender on the robbery count, and for imposition of a consecutive sentence on the endangering the welfare of a child count. The court noted three aggravating factors applicable for sentencing: the risk of defendant committing another offense, N.J.S.A. 2C:44-1(a)(3), defendant's prior criminal record and the seriousness of defendant's convicted offenses, N.J.S.A. 2C:44-1(a)(6), and the need for deterring defendant and others from violating the law, N.J.S.A. 2C:44-1(a)(9). No mitigating factors were applied.

The court sentenced defendant as follows: count two, ten years for aggravated assault, subject to the No Early Release Act ("NERA"), N.J.S.A. 2C:43-7.2; count three, five years with two-and-a-half years of parole

ineligibility for endangering the welfare of a child, to run consecutive to the sentence for count two; count four, life imprisonment extended-term as a persistent offender for robbery, subject to NERA, to run consecutive to the sentence for count three; count five, ten years for burglary, subject to NERA, to run concurrent to the sentences for counts two, three, and four; count six, five years for criminal restraint, to run concurrent with the sentences for counts two, three, four, and five; and count seven, theft, merged with count four and which was dismissed.[8]

Issues on Appeal

On appeal, defendant's counsel raises the following points in her briefs:

POINT I

THE POLICE DID NOT REQUEST OR OBTAIN CONSENT BEFORE SEARCHING DEFENDANT'S HOME. THE EVIDENCE FOUND THEREIN MUST BE SUPPRESSED.

A.  The Police Entered The House And Searched The Bedroom Before Asking For Consent. That Unlawful Conduct Necessitates Suppression Of The Evidence.

B.  It Is Unconstitutional To Purposefully Bypass A Defendant Who Is Present On The Scene And Is The

---

[8]  The trial court did enter an amended judgment of conviction, to correct an error in the description of count three in the sections "original charges" and "final charges."  The correction is not an issue on appeal.

Party Suspected Of Wrongdoing, By Seeking Consent From Another Occupant Of The Home.

C. Conclusion.

POINT II

THE FOUR WOMEN'S UNRELIABLE IDENTIFICATIONS OF DEFENDANT WERE IMPROPER AND HIGHLY PREJUDICIAL. FURTHER, AN IDENTIFICATION INSTRUCTION WAS NECESSARY [] IN ORDER FOR THE JURY TO CRITICALLY EVALUATE THE RELIABILITY, OR LACK THEREOF, OF THE IDENTIFICATIONS. THESE ERRORS NECESSITATE REVERSAL OF DEFENDANT'S CONVICTIONS.

A. The Four Women's Identifications Were Unreliable Because The Women Were Unable To See The Face Of The Man They Were Supposedly Identifying.

B. Insofar As There Was An Identifiable Face On That Video, The Jury Was Just As Well-Positioned As The Women To Determine If It Was The Defendant. The Identifications Made By The Women Therefore Added Nothing To The Jury's Fact-Finding, But Were Unduly Prejudicial.

C. The Circumstances Of The Identifications By Two Of These Women Were So Suggestive That They Should Have Been Excluded.

D. The Trial Court Erred In Refusing To Give The Requested Defense Instruction So That The Jury Could Properly Assess The Reliability Of These Identifications.

POINT III

22

THE TRIAL COURT ERRED IN ADMITTING THE VICTIM'S IN-COURT IDENTIFICATION WITHOUT A HEARING ON WHETHER THE VICTIM'S IN-COURT IDENTIFICATION HAD BEEN TAINTED BY YEARS OF PROSECUTION OF DEFENDANT AND COURT PROCEEDINGS.

POINT IV

THE TESTIMONY BY TWO WITNESSES THAT THEY WERE AFRAID OF DEFENDANT WAS INADMISSIBLE, UNDULY PREJUDICIAL CHARACTER EVIDENCE. ITS ADMISSION NECESSITATES REVERSAL OF DEFENDANT'S CONVICTIONS.

POINT V

THE TESTIMONY BY A FOOTWEAR "EXPERT" REGARDED AN INAPPROPRIATE SUBJECT OF EXPERT OPINION TESTIMONY. ITS ADMISSION NECESSITATES REVERSAL OF DEFENDANT'S CONVICTIONS. (NOT RAISED BELOW)

POINT VI

EVEN IF ANY ONE OF THE COMPLAINED-OF ERRORS WOULD BE INSUFFICIENT TO WARRANT REVERSAL, THE CUMULATIVE EFFECT OF THOSE ERRORS WAS TO DENY DEFENDANT DUE PROCESS AND A FAIR TRIAL.

POINT VII

DEFENDANT'S LIFE SENTENCE IS MANIFESTLY EXCESSIVE AND MERGER SHOULD BE ORDERED.

A-5132-15T2

REPLY POINT I

THE STATE BEARS THE BURDEN OF PROVING THAT [M.J.'S] CONSENT TO SEARCH WAS GIVEN KNOWINGLY AND VOLUNTARILY. THE ABSENCE OF EVIDENCE THAT CONSENT WAS IN FACT KNOWING AND VOLUNTARY DOES NOT REDOUND TO THE BENEFIT OF THE STATE BUT, RATHER, DEMONSTRATES THE INVALIDITY OF THE WARRANTLESS SEARCH SUPPOSEDLY BASED ON HER CONSENT.

REPLY POINT II

THAT THE STATE NEEDS CERTAIN TESTIMONY IN ORDER TO PROVE ITS CASE DOES NOT TRANSFORM INADMISSIBLE TESTIMONY INTO ADMISSIBLE TESTIMONY.

REPLY POINT III

TESTIMONY BY TWO WITNESSES THAT THEY WERE AFRAID OF DEFENDANT WAS IRRELEVANT TO ANY ISSUE IN THE CASE AND UNDULY PREJUDICIAL.

Defendant also presents this point in a pro se supplemental brief:

POINT I

DEFENDANT WAS DENIED BOTH HIS CONSTITUTIONAL RIGHT TO CONFRONTATION AND THE STATE VIOLATED THE HEARSAY RULE WHEN DET. LAVERTY MADE COMMENTS OF RECEIVING INFORMATION FROM NONTESTIFYING DECLARANTS, WHICH INCRIMINATED DEFENDANT.

24                                                        A-5132-15T2

## II.

## (Apartment Search Issues)

Defendant first argues the trial court should have granted his motion to suppress the evidence recovered during the warrantless search of M.J.'s apartment, including the blood-stained jeans. He argued below that the evidence should be suppressed because: (1) the search was the fruit of illegal tracking of his cell phone; and (2) M.J. did not voluntarily consent to the search because the police had forced their way into her apartment, and prior to the search they did not advise her of her right to withhold consent. Defendant did not argue, as he now does on appeal, that the police were obligated to obtain his personal consent to the search.

The Suppression Hearing

As we have already noted, the trial court held a pretrial hearing on this issue. At that proceeding, the court heard testimony from Sergeant Christopher Smith from the Essex County Prosecutor's Office, who was assigned to the FBI violent crimes task force, and from M.J.

Sergeant Smith testified that he became involved in investigating the Millburn home invasion after he offered the FBI's assistance to the Millburn

Police Department.  As part of the investigation, he obtained a CDW for a phone number believed to belong to defendant.

Smith explained how officers, on June 26, 2013, tracked the cell phone as it moved on the PATH train line to New York City, and thereafter to upper Manhattan.  The investigators did not follow the cell phone to Manhattan on June 26.  At that time, the investigators had only local warrants to arrest defendant and did not yet have jurisdiction to take him into custody out-of-state.

By June 28, 2013, investigating officers had obtained a UFAP warrant, which permitted them to move across jurisdictions to arrest defendant.  They also had obtained a search warrant for C.B.'s apartment on Irvine Turner Boulevard in Newark, another known address for defendant.

That day, the officers first proceeded to the Newark address, where they executed a search and planned to arrest defendant if he were present.  However, they did not find defendant at that location.

At that point, the FBI task force responded to the Tenth Avenue address in New York City, believing there was "a good chance" defendant was there.  En route, the officers learned of another cell phone associated with defendant.  The Millburn Police submitted an exigent request to receive GPS "pings" from the new phone, and began tracking it.

When the officers arrived at the Tenth Avenue apartment building, they "mustered up," began surveillance on the building's two entrances, and spent two or three hours waiting for agents from the FBI's New York City office to arrive.

Before the additional FBI agents arrived, the officers observed defendant walking out of the apartment building, and they placed him under arrest. Sergeant Smith and other members of the FBI task force then proceeded to the designated apartment. They brought defendant with them, keeping him in the tenth floor hallway.

Sergeant Smith knocked on the door of the apartment and M.J. answered. M.J. agreed to let the officers in, and after they entered the apartment they shut the door behind them. Smith stated that M.J. was fully clothed, and she was willing to speak with them.

M.J. asked what this was all about, and the officers explained why they were there, and told M.J. they had just placed defendant under arrest. Smith told M.J. she could read about the case on her computer, and she saw an article about it.

Smith asked if defendant had been at the apartment, if he lived there, and if he had brought any clothing with him, attempting to establish the nature of

M.J.'s relationship with defendant. M.J. responded defendant had brought clothing with him, and the officers asked if she could show them where defendant's clothes were. M.J. then brought the officers to a pile of clothes on the floor of her bedroom.

Smith contacted an assistant prosecutor in his office, for guidance as to how to proceed. Thereafter, the officers asked M.J. if she would consent to the removal of defendant's clothing. According to Smith, she agreed.

M.J. executed a FBI consent-to-search form, agreeing that she had been advised of her right to refuse consent, that she voluntarily consented to the search of her apartment, and that she authorized the agents to remove any items they determined were related to their investigation.

Smith denied that M.J. was threatened in any way. He recounted that she was cooperative, and she did not appear confused or afraid.

After removing defendant's clothing from the apartment, the officers transported M.J. to the Essex County Prosecutor's Office, where she gave a statement providing contradictory information as to whether defendant lived with her. On the one hand, M.J. stated that defendant comes and goes, and she "wouldn't say he lived with me." On the other hand, M.J. stated that he paid her $215 per month toward rent.

M.J. stated clearly to the police, however, that she had signed the consent to search form, and authorized the police to search her apartment. She did not claim, at that time, any misconduct on the part of the officers.

M.J. testified at the suppression hearing and stated that defendant had been with her, in her apartment, before his arrest on June 28, 2013. After he left the apartment, she undressed in preparation for a shower, and she was wearing only a tank top and underwear when she heard a knock on the apartment door.

M.J. looked through the peephole and asked who was there, and an officer responded that he was with the FBI and he wanted to ask her a few questions. According to M.J.'s testimony, when she opened the door a little bit, the officer pushed his way into the apartment. She then observed defendant on the hallway floor, with his hands cuffed behind his back.

M.J. asked the officers what defendant had done, and an officer responded that "he did to a woman . . . the same thing he did to you," and he told her to "have a seat," so she sat down on her couch. She observed about twelve to fourteen officers.

According to M.J., when she asked the police if she could put some clothes on, an officer said they would like to search the apartment, and he gave her a

29

folded-up paper to sign. She heard defendant saying "no, baby, don't sign nothing, don't sign S-H-I-T."

M.J. asked what the officers were looking for, and to see the paper she was being asked to sign. According to M.J., at that point an officer told her that if she did not sign the paper "we're gonna rip your f'ing apartment apart."

M.J. admitted in her testimony that she then signed the form. However, M.J. did not feel as though she signed it voluntarily; she claimed she signed it only to avoid having her apartment ripped up.

M.J. also denied that she brought the officers to any room in the apartment, or that she had pointed anything out to them. She also denied knowledge of any clothing belonging to defendant being in her apartment that day. However, she did identify some of his clothing in photos taken of her bedroom on the day of the search.

M.J. stated that she remained seated in the living room while the officers came in and out. She also stated that she was not allowed to dress until the search of her bedroom was complete, although she admitted that she was fully clothed in the photos the police took that day.

<u>The Court's Denial of Suppression of the Fruits of the Apartment Search</u>

After hearing this testimony and the arguments of counsel, the trial court issued an oral opinion denying the motion to suppress. As an initial matter, the court found the police had violated the law by not obtaining a CDW with respect to the second cell phone attributed to defendant. Even so, the court found the police would have proceeded to M.J.'s apartment on June 28, 2013, regardless of the cellphone data obtained, because they were aware of defendant's connection to the apartment even before that date.

Turning to the ensuing search, the court considered the totality of the circumstances as to whether M.J. had validly consented to the search of her apartment. The court credited Sergeant Smith's version of the search over M.J.'s, finding that M.J. was biased and that her testimony was inconsistent with her statement she had given to the police in 2013. Additionally, the court concluded that Smith's testimony established that M.J. voluntarily consented to the search performed of her home, notwithstanding that she did not sign the consent-to-search form until after M.J. had led the police to her bedroom and showed them defendant's clothing.

Scope of Review – Suppression Ruling

In reviewing the suppression ruling concerning the apartment search, we are mindful that an appellate court must uphold a trial court's factual findings if

they are supported by sufficient credible evidence in the record. State v. Dunbar, 229 N.J. 521, 538 (2017); State v. Elders, 192 N.J. 224, 243-44 (2007). We must generally defer to the trial court's credibility findings, based upon that court's opportunity to see and hear the witnesses testify. Elders, 192 N.J. at 244. However, we owe no deference to the trial court's interpretation of the law, or its legal conclusions based upon established facts. Dunbar, 229 N.J. at 538.

Consent Issues

Warrantless searches of homes are presumptively unreasonable under the federal and New Jersey constitutions, and the State bears the burden of proving the validity of a warrantless search, i.e., showing the search was premised upon probable cause and falls within a recognized exception to the warrant requirement. State v. Bryant, 227 N.J. 60, 69-70 (2016); State v. Cushing, 226 N.J. 187, 199 (2016). One such recognized exception to the warrant requirement is consent. Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973); State v. Domicz, 188 N.J. 285, 305 (2006).

For consent to be valid, it must be freely and voluntarily given, and not the result of duress or coercion. Schneckloth, 412 U.S. at 248; Bumper v. North Carolina, 391 U.S. 543, 548 (1968). Under the federal Constitution,

> the question whether a consent to a search was in fact "voluntary" or was the product of duress or coercion,

express or implied, is <u>a question of fact to be</u> <u>determined from the totality of all the circumstances</u>. While knowledge of the right to refuse consent is one factor to be taken into account, the <u>government need</u> <u>not establish such knowledge [of the right to refuse]</u> as the sine qua non of an effective consent.

[<u>Schneckloth</u>, 412 U.S. at 227 (emphasis added).]

The United States Supreme Court has rejected the notion that police must explicitly advise people of their right to refuse consent to the search, <u>id.</u> at 231, or that in establishing voluntariness the government must prove a person's actual knowledge of the right to withhold consent, <u>id.</u> at 234.

Under New Jersey law, like under federal law, "[a] valid consent to a search must be clear, knowing, voluntary, unequivocal, and express." <u>State v.</u> <u>Sugar</u>, 100 N.J. 214, 234 (1985). However, unlike under federal law, to meet the standard of voluntariness under the New Jersey Constitution, the State must establish that the person giving consent knew that he or she had the right to refuse consent. <u>State v. Legette</u>, 227 N.J. 460, 474-75 (2017); <u>Domicz</u>, 188 N.J. at 307.[9]

---

[9] There is no dispute that both federal and New Jersey law applies, notwithstanding that the apartment search and seizure occurred in New York State, and was executed by an FBI Task Force that was acting pursuant to a federal warrant, presumably because of the extensive cooperation and coordination between the FBI and New Jersey officers, and because their action

That being said, just as under federal law, under New Jersey law, the police are not obligated to advise a person of his or her right to refuse, at least where, as here, the person being asked for consent is not in custody. State v. Johnson, 68 N.J. 349, 354 (1975). Indeed, interpreting Johnson on precisely this point, this court has explicitly held "Johnson does not compel the police to specifically advise the property owner [or person in possession of the premises] of the affirmative right to refuse an inspection." State v. Farmer, 366 N.J. Super. 307, 314 (App. Div. 2004) (alteration in original) (quoting State v. Brown, 282 N.J. Super. 538, 548 (App. Div. 1995)). See also State v. Douglas, 204 N.J. Super. 265, 277 (App. Div. 1985) ("While the State need not prove that the third person was informed of a right to refuse consent, the State has the burden of demonstrating knowledge on the part of the third party that he had a choice in the matter.") (citations omitted).

As fact-finder at the suppression hearing, the trial court reasonably found from the evidence no inappropriate force or coercion on the part of the police officers. The court rejected M.J.'s testimony that the police had forced their way into her apartment and had threatened to tear it up. The court accepted Sergeant

---

was for the purpose of state prosecution. State v. Knight, 145 N.J. 233, 258-61 (1996); State v. Minter, 116 N.J. 269, 275-85 (1989).

Smith's testimony that the police knocked on M.J.'s door, obtained M.J.'s consent to enter, and explained to M.J. the purpose for their presence. The court further accepted Smith's testimony that the police asked M.J. if defendant had been in the apartment and left any belongings there, and, after responding "yes," M.J. brought the police to a pile of defendant's clothing on her bedroom floor.

Thus, the trial court reasonably found that, based upon the totality of the circumstances, M.J., through her words and conduct, was "very cooperative" with the police. Indeed, the court specifically noted her testimony that she agreed to the search because she had "nothing to hide and was fine showing the officers whatever they wanted to look for."

This case does not involve mere absence of resistance in the face of an assertion of police authority, as argued by defendant. The factual record, as reasonably found by the trial court, supports the court's conclusion that M.J. voluntarily and affirmatively consented to the police search that resulted in their seizure of the bloody pair of jeans. At the very least, M.J.'s behavior reasonably and objectively implied her consent. State v. Koedatich, 112 N.J. 225, 262 (1998) ("A consent sufficient to avoid the necessity of a warrant may be express or implied from the circumstances.").

As required under New Jersey law, the trial court found that M.J. understood her right to refuse the search. In this regard, the court noted that M.J. signed the consent to search form, in which she acknowledged her right to refuse, albeit after she had shown the police the pile of defendant's clothing. The court noted M.J.'s calm demeanor during her videotaped statement to the police, in which she acknowledged that the police asked for her consent to search her home, and that she authorized the search. M.J. had multiple opportunities to express objection to the search, and to claim that the search had been involuntary. Nevertheless, she did not do so.

Defendant's Belated Attempt to Object Personally to the Apartment Search

In his second argument for reversal of the suppression ruling, defendant maintains the police were required to ask for his personal consent to the search, and could not lawfully rely upon the consent given by M.J. Since this issue was not raised below, we review it for plain error. R. 2:10-2. We discern no such error, plain or otherwise, under the applicable law.

Both federal and state law recognize circumstances under which a third party may consent to a search of a defendant's home, including concepts of "common authority" and "apparent authority":

36

The third party's ability to consent to such a search rests on his or her "joint occupation" of and "common authority" over the premises. Also, in recognition of the many factual settings that confront a law enforcement agent, an officer may, depending on the circumstances, rely on the apparent authority of a person consenting to a search. Apparent authority arises when a third party (1) does not possess actual authority to consent but appears to have such authority and (2) the law enforcement officer reasonably relied, from an objective perspective, on that appearance of authority.

[Cushing, 226 N.J. at 199-200 (emphasis added) (citations omitted).]

Accord Georgia v. Randolph, 547 U.S. 103, 109 (2006); State v. Lamb, 218 N.J. 300, 318-19 (2014); State v. Suazo, 133 N.J. 315, 320 (1993).

Thus, "[a]uthority to consent to search a particular area of a home turns on common usage[.]" Cushing, 226 N.J. at 201. "[C]onsent may be obtained from the person whose property is to be searched, from a third party who possesses common authority over the property, or from a third party whom the police reasonably believe has authority to consent." State v. Maristany, 133 N.J. 299, 305 (1993) (citations omitted).

Here, the police were aware of some evidence that defendant resided in M.J.'s apartment. Their background search indicated that M.J.'s apartment was one of defendant's residences, and upon defendant's arrest the police seized a

hospital identification that indicated defendant resided in the apartment. However, the record also shows that M.J.'s apartment was very small, and defendant had no separate living space that could be deemed exclusively his. Indeed, M.J. repeatedly testified that every aspect of the apartment was hers, including the bedroom where the blood-stained jeans were found.

Thus, defendant had no reasonable expectation of exclusive privacy regarding this shared space, Brown, 282 N.J. Super. at 547, and M.J. had both actual and apparent authority to authorize the search that resulted in seizure of the blood-stained jeans, Cushing, 226 N.J. at 199-200; Maristany, 133 N.J. at 305.

Defendant relies upon Randolph, 547 U.S. at 120, in which the United States Supreme Court concluded that "a warrantless search of a shared dwelling for evidence over the express refusal of consent by a physically present resident cannot be justified as reasonable as to him on the basis of consent given to the police by another resident." Further explaining its ruling, the Court stated: "[I]f a potential defendant with self-interest in objecting is in fact at the door and objects, the co-tenant's permission does not suffice for a reasonable search, whereas the potential objector, [who is] nearby but not invited to take part in the threshold colloquy, loses out." Id. at 121 (emphasis added).

Subsequently, in Fernandez v. California, 571 U.S. 292, 303 (2014), the Court ruled that the holding of Randolph does not apply when the objecting occupant is absent when another occupant consents. In Fernandez, the police had removed the defendant from the apartment before seeking consent from the co-occupant. Ibid. Therefore, he was not present at the time the co-occupant consented, and the holding of Randolph did not apply. Ibid.[10]

In State v. Coles, 218 N.J. 322, 337-40 (2014), the New Jersey Supreme Court reviewed the United States Supreme Court's precedents on consent searches of homes, and stated:

> We take from Fernandez two things: (1) that the objective-reasonableness test prevails; and (2) that police responsibility for the unlawful detention or removal of a tenant who was prevented from being present at the scene to voice his or her objection to the search is not equivalent to other neutral circumstances causing the defendant's absence.
>
> [Id. at 340.]

---

[10] See also Illinois v. Rodriguez, 497 U.S. 177, 179-80, 189 (1990) (consent to enter apartment could be deemed valid when given by a woman police reasonably believed to be co-occupant, while defendant was sleeping in the apartment); United States v. Matlock, 415 U.S. 164, 166, 177-79 (1974) (consent to enter apartment valid when given by co-occupant, after defendant was arrested in front yard and placed in police car).

The Court held in <u>Coles</u> that the police had unlawfully detained the defendant. <u>Id.</u> at 327. Therefore, the subsequent search of his bedroom was invalid, notwithstanding that his aunt may have had authority to authorize the search. <u>Id.</u> at 347-48.

By contrast, in <u>Lamb</u>, 218 N.J. at 304-05, the Court held that consent to search was validly obtained from one occupant of a home, where all other adult occupants of the home had left, including the defendant and the defendant's stepfather, who previously had objected to a search. The Court held that the stepfather's previous objection was no longer valid once he had departed the home. <u>Id.</u> at 305, 319-22.[11]

In the present case, the motion record reflects that defendant was lawfully arrested leaving the apartment building, in which his girlfriend M.J.'s apartment was located. There was no unlawful arrest, as in <u>Coles</u>. Thereafter, defendant was lawfully detained by officers in the hallway outside of M.J.'s apartment, while other officers communicated with M.J. inside the apartment. It is unclear why the officers brought defendant from the apartment building's lobby to the

---

[11] Defendant cites out-of-state opinions, in which some courts have held that the police must obtain consent from <u>all</u> co-habitants/co-owners who are present and able to object. <u>Johnson v. State</u>, 905 P.2d 818, 821 (Okla. Crim. App. 1995); <u>State v. Leach</u>, 782 P.2d 1035, 1036, 1040 (Wash. 1989). However, New Jersey has adopted no such rule.

tenth floor hallway. The motion court was "not really sure why the police elected to take [defendant] up to the apartment, but they did, at least outside of the apartment in the hallway there."

At the suppression hearing, the testimony of Sergeant Smith and M.J. varied in several aspects. Smith testified that defendant did not make contact with M.J. during the time she was reading the consent-to-search for or signing the document, and did not at any time given M.J. an instruction regarding consenting to the search. M.J., in contrast, testified that a FBI officer pushed his way into the apartment and asked her to sign a folded-up piece paper while she sat on a couch in her living room. At this point, M.J. testified defendant yelled from the hallway "no, baby, don't sign nothing, don't sign S-H-I-T."

In evaluating this conflicting testimony, we defer to the trial court's credibility findings given the court's opportunity to see and hear the witnesses testify. Elders, 192 N.J. at 244; State v. Locurto, 157 N.J. 463, 471 (1999). The trial court noted that M.J. voluntarily submitted to a video and audio statement hours after the search of her apartment. From this video, the court found M.J. was calm, collected, and not agitated. M.J. did not indicate any problems with the search in this statement, despite being "given every single opportunity" to do so. The court found M.J. biased at the time of the suppression hearing, noting

that defendant was facing serious charges, and M.J. "every reason" to testify in a way that would benefit defendant. The court reasonably found her testimony at the suppression hearing unreliable, and instead found her video statement more credible. The court also reasonably found Sergeant Smith credible, after observing his demeanor and finding him to be candid and honest.

Defendant's alleged shouted warning may be interpreted as an attempted objection to the search. However, given the trial court's credibility findings and Sergeant Smith's testimony, which included indicating defendant did not instruct M.J. regarding consenting to the search, defendant is akin to the "potential objector, nearby but not invited to take part in the threshold colloquy," who "loses out." Randolph, 547 U.S. at 121. Accord Fernandez, 571 U.S. at 303.

In sum, applying existing precedent, there are no grounds to set aside the trial court's suppression ruling as to the apartment search. The court made well-supported factual findings to which we owe considerable deference and correctly applied the law.

## III.

### (Lay Witness Identification Issues)

Defendant next argues that he was deprived of his constitutional rights to due process and a fair trial, U.S. Const. amend. V, XIV, and N.J. Const. art. I,

¶¶ 1, 9, and 10, because the trial court erred in permitting lay witness opinion testimony from G.N., D.S.-A., C.B., and A.B., identifying him as the attacker on the nanny-cam video. He argues that (1) because the video did not clearly show the assailant's facial features, the women's identifications lacked any probative value and were unreliable, and (2) had there been identifiable facial features in the video, the jury would be equally positioned to determine whether he was the man on the video.

Defendant further argues that the circumstances of G.N.'s and C.B.'s identifications were especially suggestive, and particularly warranted exclusion of their identification testimony. Lastly, he asserts the court erred by not issuing the full jury instruction on lay identification requested by his trial counsel, and instead using an adapted federal jury charge. We reject these contentions.

The Pre-Trial Record on the Identifications

Before trial, defendant moved to exclude any testimony from witnesses identifying him as the assailant on the nanny-cam video. The court held a Rule 104 hearing on the issue over the course of three days. At that hearing, the court considered testimony from G.N., D.S.-A., A.B., and her mother, C.B. The women's motion testimony was largely consistent with their trial testimony, but contained more detail, which we present as a predicate to our analysis.

G.N.

G.N. testified that she met defendant in Newark in February 2013, and they had a relationship for the next month-and-a-half, last seeing each other in April 2013. The relationship ended because of defendant's drug use.

G.N. knew defendant's date of birth, and that he lived with another woman and her children on Irvine Turner Boulevard in Newark. She also knew that defendant was left-handed, and that he walked with a limp due to a knee injury.

G.N. was aware of defendant's criminal history because he told her about it. In particular, he admitted stealing jewelry to trade for cash, saying he did so because he had trouble finding jobs and getting assistance. He also told G.N. he had been released from prison in December 2012.

On June 25, 2013, G.N. saw the nanny-cam video on a news broadcast. She identified the man in the video as defendant, based upon his build, his bald head, his dark skin, his salt-and-pepper beard, his use of his left hand to hit the woman on the video, and his limp.

G.N. acknowledged that the assailant's face was not clearly visible on the video. She also admitted that the assailant's facial hair was not visible in the video; however, she said it was mentioned in the news story.

44

After seeing the video, G.N. researched defendant's criminal history online. She then called the number given out on the news program and was connected to the Millburn Police Department.

In speaking with the police, G.N. related her observations, and she gave them defendant's name, address, and date of birth. She did not give her real name, however, because she was scared defendant would hurt her, and she did not give the police her phone number because she did not want to be involved. G.N. also did not tell the police about the extent of her relationship with defendant because she was embarrassed she had been involved with someone like him.

On July 1, 2013, after defendant was captured, G.N. contacted the police and gave her real name. At that point she felt she was no longer fearful because defendant was in jail.

Eleven days later, G.N. gave a statement to the police. In that statement, she still held back some information because she was embarrassed. However, G.N. identified defendant from photographs and was "100 percent" certain that it was defendant on the video shown on the news.

<u>D.S.-A.</u>

D.S.-A. recounted at the pretrial hearing that she met defendant in June 2013, at a cookout in the area of Irvine Turner Boulevard in Newark. For about three weeks thereafter she saw defendant at least every other day, and she also talked and texted with him. When defendant told her that he loved her, it did not feel right to D.S.-A. because they barely knew each other, so she told him to stop communicating with her.

D.S.-A. knew defendant had a girlfriend in New York, and he was living with a woman on Irvine Turner Boulevard in Newark. She also knew defendant had recently gotten out of jail.

On June 25, 2013, D.S.-A. was watching the television news and saw video of defendant beating up a woman. She believed it was defendant on the video, based upon his clothing, his face, his build (body shape and weight), his limp, and what she described as his "Spock" ears. D.S.-A. also recognized defendant's voice from the audio on the video.

After seeing the news segment, D.S.-A. called her ex-husband. She told him that she had seen defendant on the news beating a woman, and she expressed fear because defendant was angry that she had told him not to call her anymore. A few hours later, her ex-husband arrived at her house with the police.

D.S.-A. told the police what she knew, including giving the police defendant's phone number. She later gave a formal statement to the police, in which she identified defendant in videos and in photographs. She had no doubt it was defendant.

A.B.

A.B. testified at the pretrial hearing that she had known defendant since 2008, when he began dating her mother C.B. and living with her family. He lived with them again starting in September 2012, and continuing through June 2013. As a result, A.B. was familiar with defendant's appearance and the clothing he wore.

As we have previously noted, on June 25, 2013, A.B. was watching the news on television and saw a video segment of defendant and a woman. She recognized defendant based upon his dark skin, bald head, height and weight, his clothing, and his style of movement and limp. She also recognized his voice from the nanny-cam recording.

A.B. admitted that the video did not clearly depict the assailant's facial features. Nevertheless, she said she could see defendant's facial hair on the video.

After seeing the video, A.B. went upstairs to her mother's room and told her defendant was on television. Defendant was with her mother at the time. Defendant and C.B. then watched the news, and defendant denied it was him on the video.

A.B. further testified that, a few days earlier, on June 21, 2013, defendant had approached her and her then-boyfriend and offered to sell them a Rolex watch. A.B. gave a statement to the police providing these identification details.

C.B.

C.B. testified that she first met defendant in 2008, and she began dating him at that time. He lived with her for about a year, starting in 2008, and then lived with her again starting in December 2012. In the years in-between, he also lived with her whenever he was not in jail, and when he was in jail she would visit him there.

C.B. was aware of defendant's appearance and clothing. She also was aware that in 2013 defendant was dating other women, including a woman from New York.

C.B. recalled that on June 25, 2013, while she and defendant were watching television in her bedroom, her daughter A.B. came in and said defendant was on the news. Watching the news segment, C.B. recognized

defendant as the man in the video, attacking a woman in her home. She identified him based upon his appearance, in particular his build and his style of movement.

Defendant asked C.B. if the man in the video looked like him and she responded that he did. However, defendant denied to C.B. that it was him on the video. He said he had to "see what's going on," and about twenty-to-thirty minutes later he left. C.B. did not see defendant in person after that time. However, she spoke to him by phone, and he asked if things were good by her, which she understood to mean that he was checking to see if the police had been to see her.

On June 28, 2013, C.B. gave a statement to the Prosecutor's Office, in which she identified defendant as the individual on the news video. When she later heard the video with the audio track, she also identified defendant's voice as that of the assailant.

The Court's Admissibility Rulings on the Identifications

The trial court granted the State permission to use the identification testimony of G.N., D.S.-A., A.B. and C.B., holding that it was admissible under N.J.R.E. 701 and State v. Lazo, 209 N.J. 9 (2012). The court recognized the perpetrator did not disguise himself during the crime, and defendant's

appearance had not changed substantially since the crime, factors which the court felt weighed against admission of the identification testimony. However, the court found other factors, mentioned in <u>Lazo</u>, weighed in favor of admission, specifically: (1) there were no eyewitnesses other than the victim, whose identification testimony was questionable because she was incapacitated as a result of the assault; (2) the nanny-cam video did not clearly depict the perpetrator's facial features; and (3) all of the witnesses knew defendant and were familiar with his appearance through personal or social relationships, and (4) the witnesses were not members of law enforcement.

Following the court's admissibility ruling, defense counsel suggested that a jury charge on the issue might be appropriate. The court agreed to review any such charge submitted by counsel.

<u>The Proposed and Adopted Identification Charges</u>

Before C.B. testified at trial, defense counsel requested that the court issue his proposed stylized charge, which combined components of the New Jersey charge on expert testimony, and portions of the New Jersey eyewitness identification charge. The court instead proposed reading the federal charge on lay witness opinion. <u>See</u> <u>Modern Federal Jury Instructions – Criminal</u>, 2.10, "Opinion Evidence (Lay Witnesses) (F.R.E. 701)" (2018).

There presently is no New Jersey model jury charge on evaluating lay witness opinion testimony in this particular context. The model charges on identification evidence specifically address only identifications made by eyewitnesses to the crime; they do not address identifications made based upon surveillance video of a crime. Model Jury Charge (Criminal), "Identification: In-Court Identification Only" (rev. July 19, 2012, eff. Sept. 4, 2012); Model Jury Charge (Criminal), "Identification: Out-of-Court Identification Only" (rev. July 19, 2012, eff. Sept. 4, 2012); Model Jury Charge (Criminal), "Identification: In-Court and Out-of-Court Identifications" (rev. July 19 2012, eff. Sept. 4, 2012).

Consistent with the federal charge on lay witness opinions, the court instructed the jury before C.B. testified as follows:

> Ladies and gentlemen, before I have [counsel] call the next witness, let me just inform you that as to lay witnesses, witnesses are not generally permitted to state their personal opinions about important questions in a trial. However, a witness may be allowed to testify to his or her opinion if it is rationally based on the witness's perception and is helpful to a clear understanding of the witness's testimony or to the determination of a fact in issue.
>
> In this case, I anticipate, and I'm going to permit, the testimony of up to four lay witnesses, [G.N., A.B., C.B. and D.S.-A.] to offer their opinion based on their perception. The opinion of these witnesses should receive whatever weight you think is appropriate given all the other evidence in the case and all the other

51

factors that I will discuss in my final instructions for weighing and considering whether to believe the testimony of witnesses.

Later, during the final charge conference, the court indicated its preference to issue the federal charge on lay witness opinions, while defense counsel again requested that the court read his proposed charge. The court agreed to charge a portion of defense counsel's proposed language, within the court's final charge on lay witnesses, opting to charge identification separately.

Thereafter, in the final charge, the court instructed the jurors on lay witness opinion testimony as follows:

> Lay witnesses: Witnesses are . . . not generally permitted to state their personal opinions about important questions in a trial. However, a witness may be allowed to testify to his or her opinion if it is rationally based on the witness' perception and is helpful to a clear understanding of the witness' testimony or to the determination of a fact in issue.
>
> In this case you may recall that I permitted [G.N., A.B., C.B., and D.S.-A.] to offer their opinions based on their perceptions. It is your function to determine whether the witnesses' identification of Shawn Custis as the man in the video is reliable and believable, or whether it is based on a mistake or for any reason is not worthy of belief.
>
> You must decide whether it is sufficiently reliable evidence that Shawn Custis is the man in the video. The opinions of these witnesses should receive whatever weight you think is appropriate given all the

> other evidence in the case and the other factors I just discussed in my final instructions for weighing and considering whether to believe the testimony of witnesses.
>
> [(Emphasis added).]

This final charge included some of defense counsel's proposed language. Specifically the underlined language in the quotation above, was adopted by the court at the charge conference.

Before issuing this lay witness charge, the court had already instructed the jury generically on evaluating the credibility of witnesses. Shortly after the lay witness charge, the court instructed the jury on eyewitness identification testimony with regards to the victim, including the risks of mistaken identifications, consistent with the model charge. Model Jury Charge (Criminal), "Identification: In-Court Identification Only" (rev. July 19 2012, eff. Sept. 4, 2012).

During their ensuing deliberations, the jurors asked to review the videos in evidence, including the nanny-cam video, the video from the pawn shop, and the video from the business near the victim's home. The jury also asked to watch the video of the victim's statement at the hospital. The court granted these requests, without objection by defendant.

Legal Analysis of the Identification Issues

We review the trial court's evidentiary rulings for an abuse of discretion. State v. Nantambu, 221 N.J. 390, 402 (2015). We discern no such abuse of discretion in admitting the identification evidence.

To be sure, "[c]ourts have a gatekeeping role to ensure that unreliable, misleading evidence is not admitted." State v. Chen, 208 N.J. 307, 318 (2011). Reliability is the key to the admission of identification testimony. Manson v. Braithwaite, 432 U.S. 98, 114 (1977); Chen, 208 N.J. at 318. Identification testimony "must clear two preliminary hurdles [of admissibility]: it must be sufficiently reliable to be able to prove or disprove a fact; and its probative value cannot be substantially outweighed by the risk of undue prejudice or misleading the jury." Chen, 208 N.J. at 319.

Once identification evidence has been admitted, it is for the jury to decide whether the witnesses have credibly identified defendant as the perpetrator. Lazo, 209 N.J. at 24. "Guided by appropriate instructions from the trial judge, juries determine how much weight to give" the witnesses' accounts. Ibid. "Neither a police officer nor another witness may improperly bolster or vouch for an eyewitness' credibility and thus invade the jury's province." Ibid.

Here, G.N., D.S.-A., C.B. and A.B. gave lay opinion testimony: that is, their opinions that defendant was the assailant depicted in the nanny-cam video.

Under N.J.R.E. 701, "If a witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences may be admitted if it (a) is rationally based on the perception of the witness and (b) will assist in understanding the witness' testimony or in determining a fact in issue." Also, under N.J.R.E. 704, "[t]estimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." Opinion testimony "is subject to exclusion if the risk of undue prejudice substantially outweighs its probative value." State v. Summers, 176 N.J. 306, 312 (2003).

There is no New Jersey appellate case law directly on point specifically addressing the admissibility of a lay witness's opinion testimony that identified a defendant, based upon a review of a surveillance video. However, in Lazo, 209 N.J. at 19-24, the Supreme Court considered the admissibility of lay opinion testimony from a police officer regarding the reason he selected a photo of defendant to be included in a photo array, that is, because the officer believed defendant resembled a composite sketch of the suspect.

As noted in Lazo, resolution of the admissibility of this evidence question required consideration of a number of factors. For example, a trial court should consider whether the defendant had disguised his appearance during the offense

or altered his appearance before trial; if not, then the jury could decide for itself if defendant was the person in the photograph. Id. at 22-23. Also, the court should consider whether there were additional witnesses to identify the defendant at trial, and how long the witness knew the defendant, and in what capacity. Id. at 23-24.

The Court held in Lazo that the officer was improperly permitted to give jurors his opinion that the defendant resembled a composite sketch of the suspect. Id. at 24. The Court cited favorably to State v. Carbone, 180 N.J. Super. 95 (Law Div. 1981).

In Carbone, the defendant was charged with five armed bank robberies, and the State had secured statements from individuals who knew the defendant, who identified him from photographs taken by the banks' surveillance cameras. Id. at 96-97. Citing cases from other jurisdictions, the Law Division considered a number of factors in reaching its determination that the proposed identifications were admissible, including: the fact that the defendant's appearance had changed since the time of the offense charged; the lack of eyewitnesses to the offenses charged; the extent of the potential witnesses' familiarity with the defendant, particularly at the time of the offenses charged; and the basis of the witnesses' knowledge of the defendant. Id. at 97-100. As

to the last factor, the court noted in <u>Carbone</u> that "although two of the potential witnesses [were] police officers, their relationship with [the defendant] was a personal one, not related to their status as law enforcement figures." <u>Id.</u> at 98. Therefore, the defendant's cross-examination of these witnesses would not be hampered by fear of revealing the defendant's criminal history. <u>Ibid.</u>

Although New Jersey law is sparse on the subject of the admissibility of lay opinion testimony identifying a defendant from surveillance video or surveillance photographs, there is abundant case law from other jurisdictions on the subject. Those cases generally hold that such testimony may be admissible after considering a variety of factors, including a number of the factors set forth under New Jersey case law in <u>Lazo</u> and <u>Carbone</u>.[12]

---

[12] <u>See, e.g.</u>, <u>United States v. White</u>, 639 F.3d 331, 335-36 (7th Cir. 2011); <u>United States v. Contreras</u>, 536 F.3d 1167, 1170-73 (10th Cir. 2008); <u>United States v. Beck</u>, 418 F.3d 1008, 1013-15 (9th Cir. 2005); <u>Nooner v. State</u>, 907 S.W.2d 677, 684-86 (Ark. 1995); <u>People v. Leon</u>, 352 P.3d 289, 312-13 (Cal. 2015); <u>Robinson v. People</u>, 927 P.2d 381, 382-85 (Colo. 1996); <u>Young v. United States</u>, 111 A.3d 13, 15-16 (D.C. 2015); <u>Glenn v. State</u>, 806 S.E.2d 564, 568-69 (Ga. 2017); <u>State v. Barnes</u>, 212 P.3d 1017, 1020-26 (Idaho Ct. App. 2009); <u>People v. Thompson</u>, 49 N.E.3d 393, 402-09 (Ill. 2016); <u>Gibson v. State</u>, 709 N.E.2d 11, 15-16 (Ind. Ct. App. 1999); <u>Morgan v. Commonwealth</u>, 421 S.W.3d 388, 391-92 (Ky. 2014); <u>State v. Berniard</u>, 163 So.3d 71, 89-91 (La. Ct. App. 2015); <u>State v. Robinson</u>, 118 A.3d 242, 247-52 (Me. 2015); <u>Moreland v. State</u>, 53 A.3d 449, 453-56 (Md. Ct. Spec. App. 2012); <u>Commonwealth v. Vacher</u>, 14 N.E.3d 264, 278-79 (Mass. 2014); <u>Lenoir v. State</u>, 222 So.3d 273, 276-78 (Miss. 2017); <u>State v. Gardner</u>, 955 S.W.2d 819, 823-25 (Mo. Ct. App. 1997); <u>Rossana v. State</u>, 934 P.2d 1045, 1048-49 (Nev. 1997); <u>State v. Sweat</u>, 404 P.3d 20, 22,

Contrary to defendant's argument, a few courts from other states have concluded that lay opinion testimony is more likely to be admissible when the surveillance video is of passable quality, but is grainy or shows only a partial view of the person of interest. Nooner, 907 S.W.2d at 685; Glenn, 806 S.E.2d at 569; Barnes, 212 P.3d at 1025; Thompson, 49 N.E.3d at 404. In such cases, the lay witnesses' opinions become more valuable to the jury, based upon their superior knowledge of the defendant's appearance, particularly around the time of the crime.

Here, the trial court properly considered and applied the relevant factors set forth in Lazo and Carbone, as well as other principles consistent with national case law. We find no abuse of discretion in the court's admission of the identification testimony.

The Alleged Taint of Identifications by G.N. and C.B.

We reject defendant's claim that the identifications made by G.N. and C.B. were made under suggestive conditions that especially warrant their exclusion.

24-27 (N.M. Ct. App. 2017); People v. Sanchez, 941 N.Y.S.2d 599, 606 (App. Div. 2012), aff'd, 21 N.Y.3d 216 (2013); State v. Patterson, 791 S.E.2d 517, 520-23 (N.C. Ct. App.), review denied, 794 S.E.2d 328 (2016); State v. Fripp, 721 S.E.2d 465, 467-69 (S.C. Ct. App. 2012); Woods v. State, 13 S.W.3d 100, 101-05 (Tex. Crim. App. 2000); State v. George, 206 P.3d 697, 700-02 (Wash. Ct. App. 2009). But see State v. Finan, 881 A.2d 187, 191-94 (Conn. 2005); Ibar v. State, 938 So.2d 451, 462 (Fla. 2006).

See State v. Henderson, 208 N.J. 208, 238, 268 (2011); Chen, 208 N.J. at 310-11.

At the Rule 104 hearing, G.N. testified that defendant told her about his criminal history while they were dating. Thus, she was aware of his history when she observed the nanny-cam video on the news. However, she testified that she identified defendant on the video based upon his physical characteristics, and it was only after she made the identification that she researched his criminal history online and called the police.

Defense counsel strenuously cross-examined G.N. at trial, attempting to impeach the credibility of her identification on numerous grounds. Counsel could have cross-examined G.N. about any bias in her identification based upon her knowledge of defendant's criminal history, but he chose not to do so possibly for strategic purposes.

Similarly, the record does not support defendant's argument that C.B. was unduly influenced by her daughter's A.B.'s statement that defendant appeared in the video, such that C.B.'s identification should be deemed inadmissible. Both C.B. and A.B. had known defendant since 2008. They testified that their identifications were made based upon their knowledge of defendant's

appearance and unique style of movement,[13] as well as their recognition of his voice.

Analysis of the Jury Charge

Defendant contends the court erred by not issuing the full jury charge on lay witness identification that his counsel requested, which combined elements of charges on expert testimony and identifications. As we have already noted, there is no model New Jersey charge on evaluating lay witness opinion testimony. Moreover, our model charges on identification address only identifications made by eyewitnesses to the crime, and not identifications made based upon surveillance video of the crime.[14]

Appropriate and proper charges are "essential to a fair trial." State v. Savage, 172 N.J. 374, 387 (2002); State v. Green, 86 N.J. 281, 287 (1981). "Because of the importance of proper instructions to the right of trial by jury,

---

[13] We reject defendant's novel argument that facial identifications are required in order to admit identification testimony from surveillance video. Voice and gait, as well as other characteristics, logically also can be valid identifying features. As the State's appellate counsel aptly suggested at oral argument, a person likely would be able to identify his or her own mother from a video of her walking or speaking, even if the mother's face is blotted out or indiscernible on the film.

[14] We respectfully suggest the Model Criminal Jury Charge Committee may wish to develop such charges for future use.

erroneous instructions on matters or issues material to the jury's deliberations are presumed to be reversible error." State v. Collier, 90 N.J. 117, 122-23 (1982).

"The trial court's instructions should cover all essentials and counsel may justifiably assume that fundamental matters will be covered in the charge." Green, 86 N.J. at 288. "[W]hen identification is a critical issue in the case, the trial court is obligated to give the jury a discrete and specific instruction that provides appropriate guidelines to focus the jury's attention on how to analyze and consider the trustworthiness of eyewitness identification." State v. Cromedy, 158 N.J. 112, 128 (1999).

The court "is not bound to utilize the language" requested by a party, however, and no request to charge "need be honored if the matter has otherwise been covered in the charge." Green, 86 N.J. at 290. Accord State v. Thompson, 59 N.J. 396, 411 (1971). On appeal, "[t]he charge must be read as a whole in determining whether there was any error." State v. Torres, 183 N.J. 554, 564 (2005).

Here, the trial court accurately charged the jury on evaluating witness credibility, and on evaluating lay witness opinion testimony in particular, including portions of the language lifted from defendant's proposed charge. The

jury was adequately instructed on the evaluation of the testimony given by the four women.

The court also appropriately explained to the jury general principles of eyewitness identification testimony, consistent with the model jury charge. Defendant is correct that in the identification charge the court referenced only the victim's identification, and not the identifications made by G.N., D.S.-A., and A.B. and C.B. Under the circumstances of this case, it may have been preferable for the court to edit the identification charge to also reference the four women who identified defendant from the surveillance video. However, that omission does not constitute reversible error. The jury was adequately charged on how to evaluate the women's testimony.

We therefore affirm the trial court's admission of the identification testimony of G.N., D.S.-A., A.B., and C.B., as we find no consequential error in the jury charge compelling reversal of the judgment.

IV.

(Victim Identification Issues)

Defendant next argues that his rights to due process and a fair trial were violated because the trial court erred in admitting the victim's in-court identification testimony without first holding a Rule 104 hearing on whether her

in-court identification had been tainted by the preceding years of the prosecution of defendant and the related court proceedings. We find no legal error nor any abuse of discretion as to this issue.

The Pretrial and Trial Proceedings Concerning C.R.'s Identification

Before C.R.'s trial testimony, defense counsel objected to her making an in-court identification of defendant, and requested a Rule 104 hearing to determine if her identification testimony was tainted by her exposure to media about the case, as well as the legal proceedings.

Noting that Chen was distinguishable because there was no suggestive behavior involved in the alleged taint of the victim's identification, the court denied the request for a hearing. The court found that C.R.'s exposure to media was an "estimator variable" as opposed to a "system variable."[15] Therefore, no Rule 104 hearing was needed, and the question of taint could be addressed on cross-examination, as well as in the jury instructions on identification testimony.

Thereafter, in her trial testimony, C.R. identified defendant as her assailant, and she was cross-examined extensively on that subject. Also, as we

---

[15] "[S]ystem variables" are variables "within the control of the criminal justice system," whereas "estimator variables" are variables "over which the legal system has no control." Henderson, 208 N.J. at 218.

have noted, the court instructed the jury on principles for evaluating eyewitness identification testimony, consistent with the model jury charge.

The Application of Chen and Henderson

In Chen, 208 N.J. at 311, the Supreme Court held that "even without any police action, when a defendant presents evidence that an identification was made under highly suggestive circumstances that could lead to a mistaken identification, trial judges should conduct a preliminary hearing, upon request, to determine the admissibility of the identification evidence." In such cases the court should assess the admissibility of the evidence under the following approach:

> (1) to obtain a pretrial hearing, a defendant must present evidence that the identification was made under highly suggestive circumstances that could lead to a mistaken identification, (2) the State must then offer proof to show that the proffered eyewitness identification is reliable, accounting for system and estimator variables, and (3) defendant has the burden of showing a very substantial likelihood of irreparable misidentification.
>
> [Id. at 327.]

If the defendant meets his burden of showing a very substantial likelihood of irreparable misidentification "under the totality of the circumstances," then "the identification evidence is suppressed." Id. at 326.

In <u>Henderson</u>, 208 N.J. at 288-89, the Court recognized that in order for a hearing to be ordered, the evidence of suggestiveness "in general, must be tied to a system – and not an estimator – variable." If there is insufficient evidence of a suggestive identification procedure, the court need not permit an exploration of estimator variables at a pretrial hearing; "that evidence would be reserved for the jury." <u>Id.</u> at 291. Also in <u>Henderson</u>, the Court "anticipate[d] that eyewitness identification evidence will likely not be ruled inadmissible at pretrial hearings solely on account of estimator variables." <u>Id.</u> at 294. In <u>Chen</u>, 208 N.J. at 328, the Court noted that in most cases identification evidence will be admitted, and "[i]t will remain the jury's task to determine how reliable that evidence is, with the benefit of cross-examination and appropriate jury instructions. In rare cases, however, highly suggestive procedures that so taint the reliability of a witness' identification testimony will bar that evidence altogether."

Under these legal standards, there was no necessity for a <u>Rule</u> 104 hearing in this case as to C.R.'s testimony. <u>Chen</u> and <u>Henderson</u> do not apply to in-court identifications. They apply only to <u>pretrial</u> identification procedures. Defendant does not allege any suggestive pretrial identification procedure concerning C.R., either by law enforcement or by private actors.

At most, defendant alleges that C.R.'s in-court identification of him was potentially tainted by her exposure to years of media reports regarding his arrest and prosecution. Under these circumstances, the reliability of C.R.'s identification was adequately addressed through cross-examination, State v. Clausell, 121 N.J. 298, 327-28 (1990), with the jury properly charged on how to evaluate that testimony. Henderson, 208 N.J. at 219. There was no violation of defendant's right to a fair trial arising from the situation.

V.

(Fear Testimony Issues)

Defendant argues the trial court erred in permitting G.N. and D.S.-A. to testify that they had been afraid of defendant before he was apprehended, allegedly contrary to N.J.R.E. 403 and 404(a). He claims this error was so prejudicial that it deprived him of his constitutional rights to due process and a fair trial. We disagree.

We detect no abuse of discretion or legal error in the court's rulings on this issue, and no undue prejudice from the testimony that would require a reversal.

Pertinent Background Regarding the "Fear" Testimony

Before D.S.-A. took the stand, defense counsel objected to her anticipated testimony that, after seeing the nanny-cam video, she became afraid for her own safety. The court overruled the objection and permitted the testimony, finding that the D.S.-A.'s reaction to the video was relevant to her credibility, as well as to what she did, or failed to do, after seeing the video, and "perhaps, the certainty of the opinion."

Thereafter, D.S.-A. testified as follows:

Q. And when you saw that video what was going through your mind?

A. I got scared and immediately I called my husband.

Q. Why did you get scared?

A. Because I saw what he did to her on the TV and he had angry words with me a little before that.

Q. Now . . . when you saw the defendant on the video, what did you do next, if anything?

A. I called my ex-husband and I told him to come over.

Q. Did you speak to your grandson at all at that particular time?

A. Yes, my grandson. Yes. I told him to lock all the windows and check the door.

Q. Now why did you call your ex-husband instead of the police?

67

A.  Because I didn't want to get involved.  I didn't want to have nothing to do with nothing.  I didn't want to get involved with something that had nothing to do with me.

Q.  Now what were you expecting your ex-husband to do, if anything?

A.  Protect me.

After D.S.-A.'s testimony concluded, defense counsel moved for a mistrial based upon this testimony.  The court denied the motion.

In her testimony, G.N. stated that when she first spoke with the police she did not give her true name or contact information because she was "scared"; she "didn't want [defendant] to know that [she] was calling the police on him if he didn't – you know if he didn't get caught he could just come and knock down my door, you know and beat me real bad."  She also testified that she was not truthful with the police about the extent of her relationship with defendant because she was "embarrassed and ashamed" that she had been involved with "somebody who is a horrible person."

Defense counsel then renewed his motion for a mistrial, which the court denied.  The court ruled that G.N.'s fear arose from what she had observed on the video, and it explained her interactions with the police.

In his vigorous cross-examination, defense counsel pressed G.N. on her alleged fear when she first spoke to the police, intending to show that she was not truly fearful, and she was uncertain that the man on the video was defendant. In so doing, counsel ended up eliciting from G.N., for a second time, that she feared defendant would come to her home and beat her up:

> Q.  But that makes no sense you wanted --
>
> A.  Maybe it makes no sense to you --
>
> Q.  -- him off the streets.
>
> A.  -- but it makes sense to me living at home by myself. That somebody that can kick in the door and whoop a woman in front of a baby like that.  And I'm home by myself and I'm not supposed to call the police.

Application of the Relevancy and Character Rules

Defendant maintains that this testimony from G.N. and D.S.-A. as to their fear of defendant that they experienced upon seeing the nanny-cam video constitutes inadmissible character evidence under to N.J.R.E 404(a).  He argues "[t]he women's testimony told the jury that they thought Custis was [the man in the video] because Custis was the sort of person who could do such a thing to both the victim and the women themselves."

N.J.R.E. 404(a) provides "[e]vidence of a person's character or character trait, including a trait of care or skill or lack thereof, is not admissible for the

purpose of proving that the person acted in conformity therewith on a particular occasion . . ." The testimony from D.S.-A. and G.N. did not implicate this evidentiary prohibition because, contrary to defendant's argument, the women did not testify to any knowledge that defendant was a violent person independent of his involvement in this crime. They referred to no other "prior bad acts." Rather, the women testified that they identified defendant as the assailant in the nanny-cam video, and, upon seeing that he was capable of such violence against a women alone in the house with her children, they became fearful for their own safety.

The testimony was admissible under N.J.R.E. 401 and 402 because, as the court found, it was relevant to the witnesses' credibility, and to explaining their actions after seeing the video. See State v. Rivera, 232 N.J. Super. 165, 180-81 (App. Div. 1989); State v. Scharf, 225 N.J. 547, 570 (2016) (recognizing, albeit in a hearsay context, that a person's "declarations of fear can be admitted . . . provided [they] satisfy the relevancy requirement").

In the instance of D.S.-A., the fear prompted her to call her ex-husband to protect her. In the instance of G.N., it caused her to call the police in the hope that defendant would be arrested. The expressions of fear by both women were

relevant to their credibility and the manner and timing in which they identified defendant to police authorities.

The testimony also was not so unduly prejudicial or inflammatory that it warranted exclusion under N.J.R.E. 403. The video itself depicts an extremely frightening event. Therefore, it is not surprising that these women became frightened upon recognizing a man they knew perpetrating such violence. The testimony was within the court's discretion to admit. Nor did the court abuse its authority in denying a mistrial.

## VI.
### (Footwear Expert Issue)

Defendant argues that the court erred in permitting FBI Agent McVicker to testify as a "footwear expert," since his testimony comparing still photos from the nanny-cam video with footwear pictures from Zappos.com did not require any expertise. He contends this error deprived him of his constitutional rights to due process and a fair trial. We disagree.

Since defendant did not raise this issue below, he must demonstrate plain error, that is, error "of such a nature as to have been clearly capable of producing an unjust result[.]" R. 2:10-2. We find no such plain error.

Agent McVicker's testimony was quite short. Preliminarily, he explained his education, training, and experience as a footwear analyst for the FBI, which included make and model determinations based upon photographic evidence, and defense counsel did not object to his qualifications as an expert in this subject matter.

Substantively, McVicker explained his process in determining the make and model of the shoe worn by the assailant, based upon his review of still photographs taken from the nanny-cam video, and his comparison of those photographs to footwear photos found on Zappos.com. Based upon this analysis, he concluded that the assailant wore Nike Air Ring Leader Low shoes.

The court instructed the jury on evaluating expert testimony, both at the time Agent McVicker testified, and in the final jury instructions.

Under N.J.R.E. 702, "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." There are three requirements for the admission of expert testimony in New Jersey criminal cases: (1) the testimony concerns a subject matter beyond the ken of the average juror; (2) the field testified to is at a state-of-the-art, most

advanced level, such that the expert's testimony may be deemed sufficiently reliable; and (3) the witness must have sufficient expertise to offer the proposed testimony. State v. Rosales, 202 N.J. 549, 562 (2010); see also State v. J.L.G., 234 N.J. 265, 280 (2018).

Defendant contends the agent's testimony did not concern a subject matter that is beyond the ken of the average juror. In support of his argument, he cites State v. Johnson, 120 N.J. 263, 293-95 (1990), in which the Court concluded that a witness could testify regarding footprint identification without being qualified as an expert, because "footprint identification is an area in which lay-opinion testimony is acceptable[.]" Accord State v. Harvey, 121 N.J. 407, 427 (1990); State v. Deluca, 325 N.J. Super. 376, 393 (App. Div. 1999), aff'd as modified, 168 N.J. 626 (2001). The Court held in Johnson that the failure to qualify a witness as a footprint expert did not render inadmissible his testimony comparing the crime-scene print to the defendant's shoes. 120 N.J. at 294-95. However, the Court found error in bolstering the witness's shoeprint testimony by qualifying him as a fingerprint expert. Id. at 295.

In the present case, the State appropriately qualified Agent McVicker as an expert in footwear make and model determinations. The expert designation did not comprise, as defendant argues, improper "bolstering."

Even absent the expert qualification, Agent McVicker's testimony was admissible as part of law enforcement's analysis of the nanny-cam video and its attempt to identify the assailant's footwear. Under N.J.R.E. 701, Agent McVicker was permitted, at the very least, to present lay opinion testimony regarding his conclusion as to the make and model of the assailant's shoes. The testimony was properly based on his personal observations, and was permissible under the lay opinion rule. Cf. State v. McLean, 205 N.J. 438 (2011) (explaining the circumstances in which a police officer may provide lay opinions in criminal cases).

Lastly, even if the court erred in admitting this opinion testimony, such an error was not clearly capable of producing an unjust result. Defendant did not vigorously dispute Agent McVicker's conclusion that the assailant wore Nike Air Ring Leader Low shoes. Defense counsel noted only that other Nikes may have had a similar appearance, Nike is a popular brand, there was no evidence on how many Nike Air Ring Leader Low shoes were sold in the area, and the shoes may have been counterfeit. Counsel also did not dispute that a pair of Nike Air Ring Leader Low shoes were seized from M.J.'s apartment upon defendant's arrest; counsel noted only that no blood was found on the sneakers,

which one would expect if defendant had been the assailant who kicked C.R. in the face.

In sum, we find no error in the admission of Agent McVicker's testimony concerning the footwear, and no grounds to mandate a new trial.

## VII.

## (Other Issues)

The remaining issues presented by defendant and his appellate counsel warrant only brief comment.

In his pro se supplemental brief, defendant contends he was deprived of his constitutional rights of confrontation when Police Officer Keith Laverty alluded to other evidence and information from other persons, which helped establish that defendant was a suspect in the home invasion. Defendant's trial counsel did not object to this testimony. We detect no plain error in its admission. To the extent the officer alluded without specification to other evidence or information received from other persons in these brief passages, such allusions were harmless. See State v. Macon, 57 N.J. 325 (1971).

We reject defendant's contention that his sentence is manifestly excessive. The trial court had the special advantage of having observed this entire violent episode filmed on video. Given defendant's lengthy and "rather staggering"

prior criminal record as a persistent offender, the court appropriately granted the State's motion to impose an extended term of incarceration on the first-degree robbery pursuant to N.J.S.A. 2C:44-3(a). The extended term of life imprisonment comported with State v. Pierce, 188 N.J. 155, 169 (2006). The court reasonably identified and weighed the pertinent aggravating factors, and reasonably found no mitigating factors, all in accordance with State v. Fuentes, 217 N.J. 57, 70 (2014).

There was no impermissible double-counting of factors. The consecutive sentence for child endangerment of the victim's three-year-old daughter, who witnessed the brutal attack, is justified under State v. Yarbough, 100 N.J. 627, 639 (1985). The sentence, while at the upper end of the permissible range, does not shock the judicial conscience. State v. Bieniek, 200 N.J. 601, 607-08 (2010). As the State concedes, the judgment of conviction should be amended, however, to reflect the merger of the aggravated assault conviction into the robbery conviction.

All other arguments raised by defendant, including his claims of cumulative error, lack sufficient merit to warrant discussion. R. 2:11-3(e)(2).

Affirmed, except for the agreed-to merger of the aggravated assault count into the robbery count.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5132-15T2